UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL A. WATT,

       Plaintiff,                 Civil Action No. 15-12833
                                     Honorable Thomas L. Ludington
        v.                 Magistrate Judge Elizabeth A. Stafford

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

       Defendant.
_____/

**REPORT AND RECOMMENDATION ON CROSS-
MOTIONS FOR SUMMARY JUDGMENT [R. 16, 20]**

Plaintiff Michael A. Watt appeals a final decision of defendant

Commissioner of Social Security ("Commissioner") denying his applications

for disability insurance benefits ("DIB") and supplemental security income

benefits ("SSI") under the Social Security Act (the "Act"). The Honorable

Thomas L. Ludington referred this matter to this Court for a Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Both parties have

filed summary judgment motions and supplemental briefs. [R. 16; R. 20; R.

21 R. 25; R. 26]. After review of the record and a hearing on July 8, 2016,

the Court finds that the administrative law judge's ("ALJ") decision is

supported by substantial evidence, and thus **RECOMMENDS**:

- **GRANTING** the Commissioner's motion [R. 20];

- **DENYING** Watt's motion [R. 16]; and

- **AFFIRMING** the Commissioner's decision, pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   BACKGROUND

### A.   Watt's Background and Disability Applications

Born June 19, 1960, Watt was 51 years old when he submitted his applications for disability benefits on January 31, 2012.  [R. 12-6, Tr. 318]. He last worked in March 2009 as a grocery clerk.  [*Id.*, Tr. 323].  Watt alleges a closed disability period from July 7, 2010 through October 5, 2012, claiming disability due to bipolar disorder, depression, attention deficit disorder, dyslexia, hepatitis C, anxiety, chronic back pain, and knee swelling and pain.[1]  [*Id.*, Tr. 364; R. 16, PgID 869].

After both disability applications were denied initially, Watt requested a hearing, which took place on December 16, 2013, and included testimony from Watt, his case worker (Donald Wiggins), and a vocational expert ("VE").  [R. 12-2, Tr. 82-124].  The hearing continued on March 18, 2014,

---

[1] A closed period of benefits was requested because Watt's was incarcerated at the time of the hearing.  [R. 12-2, Tr. 87-89].  He was prohibited from receiving benefits while he was imprisoned.  42 U.S.C. §§ 402(x)(1)(A)(i) and 1382(e)(1)(A).  Thus, Watt is not claiming that he recovered after the closed period.

with additional testimony from the VE.  [*Id.*, Tr. 45-80].  In an April 2, 2014 written decision, the ALJ found Watt to be not disabled.  [*Id.*, Tr. 21-39]. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner, and Watt timely filed for judicial review.  [*Id.*, Tr. 1-3; R. 1].

## B.    The ALJ's Application of the Disability Framework Analysis

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant may file a claim for benefits for a closed period.  *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972).  "In a 'closed period' case, the decision maker determines [whether] a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision." *Pickett v. Bowen*, 833 F.2d 288, 289 n. 1 (11th Cir. 1987).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps.  First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled.  20 C.F.R. §§

3

404.1520(a)(4), 416.920(a)(4).[2]  Second, if the claimant has not had a

severe impairment or a combination of such impairments[3] for a continuous

period of at least 12 months, no disability will be found.  *Id.*  Third, if the

claimant's severe impairments meet or equal the criteria of an impairment

set forth in the Commissioner's Listing of Impairments, the claimant will be

found disabled.  *Id.*  If the fourth step is reached, the Commissioner

considers its assessment of the claimant's residual functional capacity

("RFC"), and will find the claimant not disabled if he or she can still do past

relevant work.  *Id.*  At the final step, the Commissioner reviews the

claimant's RFC, age, education and work experiences, and determines

whether the claimant could adjust to other work.  *Id.*  The claimant bears

the burden of proof throughout the first four steps, but the burden shifts to

the Commissioner if the fifth step is reached.  *Preslar v. Sec'y of Health &*

*Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Watt was not

disabled.  At the first step, he found that Watt had not engaged in

substantial gainful activity during his closed period of disability.  [R. 12-2,

Tr. 23].  At the second step, the ALJ found that Watt had the severe

---

[2] Sections 1520(a)(4) and 920(a)(4), which pertain to DIB and SSI
respectively, list the same five-step analysis.

[3] A severe impairment is one that "significantly limits [the claimant's]
physical or mental ability to do basic work activities."  § 1520(c); § 920(c).

4

impairments of hepatitis C, osteoarthritis of the lumbar spine, osteoarthritis of the bilateral knees, history of left foot injury and laceration, bipolar disorder, panic disorder with agoraphobia, mood disorder-NOS, and history of polysubstance abuse.  [*Id.*, Tr. 24].  However, he found Watt's allegations of illiteracy, dyslexia, and learning disability to be non-medically determinable impairments.  [*Id.*].  At the third step, the ALJ concluded that none of Watt's impairments, either alone or in combination, met or medically equaled the severity of a listed impairment.  [*Id.*, Tr. 25].

Next, the ALJ found that Watt had the RFC to perform light work, except that:

> [H]e should never use ladders, scaffolds, or ropes; must avoid concentrated exposure to hazards including dangerous and unprotected machinery or heights; occasionally bend, twist, or turn at the waist; do no commercial driving; no foot pedal usage; requires simple unskilled work with an SVP rating of one or two; work involving one, two, or three step instructions; no jobs involving concentration on detailed/precision tasks or multitasking, reading, computing/calculating, or problem[] solving; jobs that do not require team work or working in close physical proximity of co-workers; work that involves minimal contact and directions from a supervisor; work requiring only brief and superficial contact with the public; and routine work at a flexible pace that have [sic] no production quotas mandating a specific number of pieces per hour or an up-line or down-line co-worker depending on the claimant's productivity.

[R. 12-2, Tr. 28].  At step four, the ALJ found that Watt could not perform past work.  [*Id.*, Tr. 37].  With the assistance of VE testimony, the ALJ

5

determined at step five that based on Watt's age, work experience, "limited education" and RFC, he could perform the position of battery inspector, for which significant jobs existed in the national economy.  [*Id.*, Tr. 37-38].

## II.   ANALYSIS

Pursuant to § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted).  Only the evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence.  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

The significant deference accorded the Commissioner's decision is conditioned on the ALJ's adherence to governing standards.  "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings."  *Gentry*, 741 F.3d at 723.  *See also Rogers*,

6

486 F.3d at 249.  In other words, substantial evidence cannot be based upon fragments of the evidence, and "must take into account whatever in the record fairly detracts from its weight."  *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal quotation marks and citation omitted).

The Commissioner must also adhere to its own procedures, but failure to do so constitutes only harmless error unless the claimant has been prejudiced or deprived of substantial rights.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009).  An ALJ's failure to use an "adjudicatory tool" that does not change the outcome of the decision is harmless.  *Id.* at 655-56.  On the other hand, substantial errors like ignoring evidence in the record or failing to follow the treating physician rule are not harmless.  *Id.*; *Gentry*, 741 F.3d at 723, 729; *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011).

Watt argues that the ALJ erred in either failing to find that he was illiterate, or in failing to develop the record to permit a finding on the subject; and erred at step five in finding that he could perform work as a battery inspector and that a significant number of jobs existed for that

7

position in the national economy.[4]  The Court disagrees and recommends affirming the ALJ's decision.

## A.

According to the regulations, "[i]lliteracy means the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling."  20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  The ALJ found that Watt had a "limited education"[5] and was thus not illiterate.  [R. 12-2, Tr. 24, 37].  Watt contends that the ALJ erred in failing to find him illiterate, and that, if he had been found to be illiterate, Medical-Vocational Rule 202.09 would have required a finding of disability.  The Court disagrees.

As a preliminary matter, it is unclear whether Rule 202.09 would apply to Watt had the ALJ found him to be illiterate, because he has

---

[4] With the exception of arguing that the ALJ erred in finding him literate, Watt does not dispute the ALJ's RFC assessment.  Thus, it is only necessary to discuss parts of the record related to Watt's literacy.  Discussing Watt's other physical and mental impairments is unnecessary.

[5] "Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs.  We generally consider that a 7th grade through the 11th grade level of formal education is a limited education."  §§ 1564(b)(3), 964(b)(3).

previous work experience as a grocery clerk and parts assembler, both of which are "semi-skilled" positions, [R. 12-2, Tr. 37, 114-15].  20 C.F.R. Part 404, Subpart P, App. 2, Table 2, Rule 202.09 (directing a finding of disabled for a claimant "approaching advanced age" (i.e., ages 50-54) who is illiterate and has <u>no prior work experience</u> or only "<u>unskilled</u>" work experience).  However, during the hearing before this Court, the Commissioner agreed that Watt would be considered unskilled if he has no transferrable skills.  20 C.F.R. § 416.965(a) ("If you cannot use your skills in other skilled or semi-skilled work, we will consider your work background the same as unskilled."); *Winstead v. Comm'r of Soc. Sec.*, No. 1:06CV590, 2008 WL 819073, at *5 (S.D. Ohio Mar. 25, 2008) (Rule 202.09 applies if claimant is illiterate and has no transferable skills).  Here, the ALJ did not determine whether Watt has transferable skills, and Watt argues that this omission requires remand.  The Court disagrees because substantial evidence supports the ALJ's finding that Watt is not illiterate.

In discussing Watt's literacy, the ALJ found that because the evidence stemmed mainly from Watt's own subjective complaints and the record lacked any diagnosis of illiteracy, dyslexia, or a learning disability by an acceptable medical source based on objective evidence, Watt's allegations of illiteracy, dyslexia and learning disability were non-medically

9

determinable impairments.  [R. 12-2, Tr. 24].  The ALJ reasonably relied on the fact that no objective evidence supported Watt's allegations of illiteracy. *See Smith v. Comm'r of Soc. Sec.*, No. 13-12759, 2015 WL 899207, at *22-23 (E.D. Mich. Mar. 3, 2015) ("although plaintiff has been diagnosed with a learning disorder and borderline intellectual functioning and found to have 'low reading skills,' plaintiff has not submitted any diagnosis or opinion by a medical or educational professional that he is functionally illiterate").

The ALJ further found that multiple factors in the record undermine Watt's literacy allegations.  He noted that Watt's alleged reading and writing difficulties did not prevent him from getting and holding semi-skilled level jobs as a grocery clerk and parts assembler at substantial gainful activity levels.  [R. 12-2, Tr. 24, citing R. 12-5, 302-04, 310-11; R. 12-6, Tr. 370, 389].  The ALJ was entitled to find that Watt's prior work in semi-skilled positions contradicted his allegations of illiteracy.  *Range v. Soc. Sec. Admin.,* 95 Fed. Appx. 755, 757 (6th Cir. 2004) (finding that plaintiff's education level and skills did not satisfy the definition of illiterate under the regulations, where although he testified that he could not read or write, plaintiff had a tenth or eleventh grade education, attended mechanics school, and performed semi-skilled work his entire life); *Smith*, 2015 WL 899207, at *22 (relying on plaintiff's employment in semi-skilled jobs as a

10

factor in undermining his allegation of illiteracy).  *See also Glenn v. Sec'y of Health & Human Servs.,* 814 F.2d 387, 391 (7th Cir. 1987) (describing the literacy standard as "quite low," and explaining that the relevant inquiry is "whether the applicant is so deficient in ability to read and write that he cannot obtain even an unskilled job").  Watt failed to challenge the ALJ's reliance on his prior semi-skilled work in his briefs or during the hearing.

The ALJ further relied on the Disability Determination Explanation forms dated March and April 2012, in which the State agency medical consultant noted that Watt was able to read a paragraph without difficulty. [R. 12-2, Tr. 24, citing R. 12-3, Tr. 130, 133].  He also pointed to Watt's statements in his February 2012 function report indicating that he used public transportation and was able to handle money, including handling a savings account and using a checkbook/money orders – which, the ALJ noted, are activities requiring some ability to read or write.  [R. 12-2, Tr. 24, citing R. 12-6, Tr. 346; R. 12-7, 486].  This evidence supports the ALJ finding that Watt is not illiterate.

The Commissioner highlights other evidence in the record that supports the ALJ's finding, including that when Watt filed his disability applications, he indicated that he could read and write, [R. 12-6, Tr. 322]; during a face-to-face interview with a representative for the Commissioner,

Watt had no problem reading or writing, [*id.*, Tr. 320]; and a medical progress note indicates that Watt reported that he passed the time in jail by reading, [*see* R. 12-7, Tr. 782].

The ALJ also relied on the fact that Watt received "C" grades in English and spelling vocabulary in ninth grade as support that he is not illiterate.  [R. 12-2, Tr. 24, citing R. 12-6, Tr. 383].  And he further concluded that Watt's ability to fill out his function report sufficiently contradicts his illiteracy allegation.  [R. 12-2, Tr. 24, citing R. 12-6, Tr. 343-50].  Watt argues that the ALJ erred in relying on these two facts because the regulations indicate that the numerical grade one completes is not necessarily indicative of a claimant's education, and because Donald Wiggins, Watt's case worker from July 2010 to October 2012, testified that he had to fill out paperwork for Watt because he could not understand written instructions [*see* 12-2, Tr. 110].  These arguments are unavailing.

Although "the numerical grade level that [Watt] completed in school may not represent [his] actual educational abilities," §§ 404.1564(b), 416.964(b), the more common inference is that a person with 9-10 years of education possesses some ability to read and write, such that they are not illiterate.  *See Smith*, 2015 WL 899207, at *22; §§ 1564(b)(1), 964(b)(1) ("Generally, an illiterate person has had little or no formal schooling.").

12

Furthermore, although Wiggins testified he filled out forms for Watt, he never testified that he specifically filled out the function report, and the Commissioner correctly points out that the form was signed by Watt and written in the first person [R. 12-6, Tr. 345, 348-50]; the ALJ's inference was not unreasonable. *See Frear v. Astrue*, No. 12-4532-JPR, 2013 WL 454902, at *6 (C.D. Cal. Feb. 6, 2013) ("the handwriting repeatedly uses the first person, indicating that it was actually completed by Plaintiff").  The reasonableness of the ALJ's conclusions are what this Court must evaluate.  "The substantial-evidence standard is met if a reasonable  mind might accept the relevant evidence as adequate to support a conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citation and internal quotation marks omitted).

For that reason, the numerous citations in the record that Watt relies on in support of his argument that he is illiterate do not warrant remand. He notes that he reported and/or testified that he is unable to read or write; he reads at a 3rd grade level; he is dyslexic, transposes numbers, and when reading, words get jumbled up and he sees things differently than what is there; he was passed along in school without learning much; and he was placed in special education classes in either 10th or 11th grade. [R. 12-2, Tr. 100; R. 12-7, Tr. 412, 424, 582, 620, 714].  Although he

13

finished 10th grade, and part of 11th, he received "E" grades for all classes in those years,[6] and he attempted but was unable to obtain his GED.  [R. 12-2, Tr. 88, 99-100; R. 12-6, Tr. 383].  Moreover, in a March 2009 psychiatric examination report, David Forsythe, M.D., estimated that Watt's intelligence was "below average" [R. 12-7, Tr. 412], and a March 2011 consultative examination report signed by Shelley Bonanno, M.A., and Lisa Silverman, Ph.D., indicated the need to "R/O" (i.e., rule out) reading disorder[7] [id., Tr. 436].  Lastly, Watt points out that Wiggins testified that he did not believe Watt could engage in competitive employment due to his inability to read or follow written instructions, and that he had to fill out paperwork for him because he could not understand the instructions.  [R. 12-2, Tr. 107, 110].

Although Watt correctly points out that the record contains evidence that he has trouble reading and writing, the standard here is whether the ALJ's decision is supported by substantial evidence – not whether evidence

---

[6] Watt's counsel argues that poor performance is likely the reason he dropped out of school.  [R. 16, PgID 868].  However, during a medical examination, Watt reported that he dropped out due to alcohol consumption.  [R. 12-7, Tr. 412].

[7] This does not constitute a diagnosis of reading disorder.  *See Merancy v. Astrue*, No. 3:10-cv-1982, 2012 WL 3727262, at *7 (D. Conn. May 30, 2012) (citing cases).  The ALJ incorrectly concluded that this note meant that a reading disorder diagnosis was "ruled out."  [R. 12-2, Tr. 24].  This error is harmless because this note does not constitute a diagnosis, and other substantial evidence supports the ALJ's findings.

14

also supported an alternative finding. *Rogers*, 486 F.3d at 241 ("In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). Here, substantial evidence supports the ALJ's finding that Watt was not illiterate, and the Court will not upset that finding even though Watt cites to evidence that supports an alternative finding.

Watt also argues that the ALJ erred in failing to develop the record by ordering a literacy examination. However, "[a]n ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests.") (emphasis added in *Foster*)). *See also Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir.1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.").

The record here contained sufficient evidence regarding Watt's ability to read and write for the ALJ to make a reasoned and supported finding on whether he was illiterate.  As explained above, the ALJ supported his finding that Watt was not illiterate with substantial evidence, such that it was unnecessary to order any additional testing to further develop the record.  Moreover, although Watt may not be a proficient reader or writer, the ALJ accounted for his limitations by including in the RFC that he "requires simple unskilled work with an SVP rating of one or two; work involving one, two, or three step instructions; no jobs involving concentration on detailed/precision tasks or multitasking, reading, computing/calculating, or problem[] solving."  [R. 12-2, Tr. 28].  The ALJ's literacy finding and RFC determination are supported by substantial evidence, and he did not err in failing to order literacy testing.

**B.**

At step five of the five-step analysis, the burden shifts to the Commissioner to prove that a significant number of jobs exist in the national economy that the claimant is capable of performing.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).  Here, the ALJ found that Watt was capable of performing the requirements of the battery inspector occupation, of which 250,000 jobs existed in the national

16

economy.  [R. 12-2, Tr. 38, 73].  Watt argues that the ALJ erred at step five in finding that he could perform work as a battery inspector, and that a significant number of jobs existed in the national economy that he could perform.  The Court disagrees.

In making his step five finding, the ALJ relied on VE testimony.  At the initial hearing date, the VE testified that a hypothetical claimant with Watt's characteristics, including RFC and restrictions, could perform work as a bottle packer, sorter, and battery inspector.  [R. 12-2, Tr. 115-16]. However, at the second hearing date, she testified that the packer job was eliminated because it required foot pedal usage, which was inconsistent with the RFC.  [*Id.*, Tr. 60-61].  When questioned further regarding her numbers for the other two jobs, the VE said that her conclusions were based on the Dictionary of Occupation Titles ("DOT"), the Bureau of Labor Statistics ("BLS"), and her nearly 30 years of experience in vocational rehabilitation.  [*Id.*, Tr. 58, 116].

Upon further examination by Watt's counsel, the VE concluded that she could not provide "solid numbers" for the sorter position based on all of the restrictions in the RFC, and because the BLS only gave general job numbers without going into detail regarding job requirements.  [R. 12-2, Tr. 58, 63, 66].  However, she opined that she could give reliable numbers for

17

the battery inspector position because it was "very simple" and required only identifying what damaged batteries looked like, such that the number of jobs for this position would not be eroded by the RFC's restrictions.[8]  [*Id.*, Tr. 72-74].  She concluded that 250,000 jobs existed in the national economy for the battery inspector position that a person with the restrictions in the RFC could perform.  [*Id.*].

Watt argues that the VE was not qualified to testify regarding the number of jobs nationally because she had not been involved with vocational rehabilitation outside of Michigan.  He further contends that the numbers provided by the VE are not reliable because she used the BLS, which provides total number of jobs existing for DOT job titles by code, without considering restrictions or limitations within a given job.  As such, Watt contends, the VE could not provide "solid" numbers for actual jobs suitable to his limitations.  These arguments are unavailing.

The fact that the VE had not worked in vocational rehabilitation at the national level does not make her testimony unreliable.  *See Collins v. Astrue*, No. 07-1368-JTM, 2009 WL 635138, at *4 (D. Kan. Mar. 10, 2009) (finding that the ALJ did not err in relying on the VE's testimony, and

---

[8] Watt repeatedly argues that the VE testified that she could not provide solid numbers for any positions because of his limitations, but the VE plainly testified, "I think that 250,000 national jobs could be done by somebody with this . . . limitation."  [R. 12-2, Tr. 73].

rejecting the claimant's argument that the VE "was not a reliable witness …

since [he] ha[d] no experience in placing people in … jobs at the national

level"). Moreover, the regulations specifically list the BLS as a resource

that provides reliable job information for determining what work exists in the

national economy. *See* 20 C.F.R. §§ 404.1566(d)(5), 416.966(d)(5). *See*

*also Pitcher v. Astrue*, No. 305-0672, 2008 WL 619175, at *7 (N.D.N.Y.

Mar. 3, 2008) (rejecting argument that the ALJ erred in relying on the

testimony of a qualified VE who based her opinions on the DOT and BLS

numbers). Here, like in *Pitcher*, the ALJ was justified in relying on the VE's

testimony, because she was qualified and she based her numbers on the

DOT and BLS, as well as her extensive experience in vocational

rehabilitation.

Watt further argues that the VE's conclusions are unsupported and

the ALJ erred in relying on the VE because the DOT's job description for a

battery inspector includes requirements that are inconsistent with the RFC

assessment. As the Commissioner correctly points out, the implication of

Watt's argument is that it should be bound by the DOT's characterization of

the battery inspector occupation. However, the Sixth Circuit has ruled to

the contrary, finding that an ALJ may "rely solely on the vocational expert's

testimony[,] ... [because the] regulations do not require the [Commissioner]

19

or the [VE] to rely on classifications in the *Dictionary of Occupational Titles.*"  *Conn v. Sec'y of Health & Human Servs.*, 51 F.3d 607, 610 (6th Cir. 1995); *see also Basinger v. Sec'y of Health & Human Servs.*, 33 F.3d 54, 1994 WL 421726, at *1 (6th Cir. Aug. 11, 1994) (finding claimant's argument that the Commissioner "erroneously relied on the [VE's] testimony because his opinion was inconsistent with the job descriptions set forth in the [DOT]" to be meritless, because the VE and Commissioner "were not required to rely on the job classifications of the [DOT]").

Watt cites the Seventh Circuit as being critical of VE testimony based upon narrow job categories from the DOT.  [*See* R. 26 (citing *Herrmann v. Colvin*, 772 F.3d 1110, 1113 -14 (7th Cir. 2014) and *Alaura v.Colvin*, 797 F.3d 503, 508 (7th Cir. 2015)].  The problem with this argument is that the VE based her testimony on the BLS and her 30 years of experience, in addition to the DOT, [R. 12-2, Tr. 58, 116], and the Sixth Circuit has held that "the ALJ was within his rights to rely solely on the vocational expert's testimony."  *Conn*, 51 F.3d at 610.  *See also Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir. 2008).  When pressed during the hearing, Watt's counsel was unable to cite any Sixth Circuit authority that would permit this Court to reject the VE's reliance on the DOT, BLS and her experience.  The Seventh Circuit authority is insufficient, as it has noted that there is a circuit

split with respect to "the appropriate interaction between the *Dictionary* and a vocational expert."  *Donahue v. Barnhart*, 279 F.3d 441, 445 (7th Cir. 2002) (collecting cases).

Finally, the Commissioner correctly notes that the ALJ's burden is satisfied at step five with a finding of only a fraction of the 250,000 inspector jobs that the VE testified were available.  *See Nejat v. Comm'r of Soc. Sec.*, 359 Fed. Appx. 574, 579 (6th Cir. 2009) (citing 500 to 2500 jobs as being sufficient).  Watt provides no basis for this Court to find that his limitations would reduce the available inspector jobs below a sufficient number.

Accordingly, the ALJ did not err in relying on the VE's testimony, and substantial evidence supports the ALJ's step five finding.

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's motion for summary judgment [R. 20] be **GRANTED**, Watt's motion [R. 16] be **DENIED**, and the Commissioner's decision be **AFFIRMED**, pursuant to sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: July 13, 2016

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ.

P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any

further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.

Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638

F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail

to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation.  *Willis v. Sec'y of HHS*,

931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local

231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be

served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"

etc., and **must specify** precisely the provision of this Report and

Recommendation to which it pertains.  Not later than fourteen days after

service of objections, **the non-objecting party must file a response** to

the objections, specifically addressing each issue raised in the objections in

the same order and labeled as "Response to Objection #1," "Response to

Objection #2," etc.  The response must be **concise and proportionate in**

22

**length and complexity to the objections**, but there is otherwise no page

limitation.  If the Court determines that any objections are without merit, it

may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served
upon counsel of record and any unrepresented parties via the Court's ECF
System to their respective email or First Class U.S. mail addresses
disclosed on the Notice of Electronic Filing on July 13, 2016.

s/Marlena Williams____
MARLENA WILLIAMS
Case Manager
